J-S14002-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.D.N.T.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.R., MOTHER | : : : : : : : | |
| | : | No. 3185 EDA 2017 |

Appeal from the Order Entered August 15, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000753-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: L.M.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.R., MOTHER | : : : : : : : | |
| | : | No. 3186 EDA 2017 |

Appeal from the Order Entered August 15, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000754-2017

BEFORE:   OTT, J., McLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY OTT, J.:                         **FILED JUNE 05, 2018**

R.R. ("Mother") appeals from the decrees entered in the Court of Common Pleas of Philadelphia County on August 15, 2017, involuntarily terminating her parental rights to her son, T.D.N.T.R., born in February of 2015, and her daughter, L.M.R., born in April of 2011 (collectively, "Children"). Mother's court-appointed counsel has filed a petition for leave to withdraw as

_____
*   Retired Senior Judge assigned to the Superior Court.

counsel and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967). We grant counsel's petition and affirm the decrees.

In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court set forth the factual and procedural history of this case, which the testimonial evidence supports. As such, we adopt it herein. **See** Trial Court Opinion, 11/9/17, at 2-17.

By way of background, on April 17, 2015, the Department of Human Services ("DHS") became involved with Mother, E.B. ("Father"), and the Children upon receiving a report alleging that T.D.N.T.R. had fallen in the home and sustained nearly fatal injuries. Trial Court Opinion, 11/9/17, at 2-3, 5. Mother's explanation of the incident was "while she and Father were arguing, Father raised his hand as if to strike her while she was holding the [c]hild and she dropped the [c]hild on a mattress to protect him[.]" **Id.** at 3. On April 20, 2015, DHS met with Mother who stated, "Mother and Father argued and Father physically assaulted her while she was holding T.D.N.T.R.; that she dropped him onto a mattress during the incident and later fell on top of him as Father continued to assault her[.] . . ." **Id.** at 4.

T.D.N.T.R.'s diagnosis was "acute or chronic bilateral subdural hemorrhages, multilayer retinal hemorrhages in both eyes, a closed right rib fracture, and a cervical spine injury, most likely due to abusive head trauma in the absence of accidental trauma to account for the injuries." **Id.** at 6. On April 21, 2015, DHS received a supplemental report alleging that, "the [c]hild

was in critical condition based on suspected abuse; that he had internal bleeding from old and new injuries; and that it was not known at that time if the [c]hild would survive." *Id.* at 5. The report alleged that Mother's explanation did not match T.D.N.T.R.'s injuries. *Id.* at 3. Rather, the report alleged that, due to his injuries, T.D.N.T.R. "would had to have fallen from a waist-high height onto a hard surface." *Id.*

With respect to the older female child, L.M.R., who was nearly four years old at the time of the incident involving T.D.N.T.R., DHS learned from hospital staff on April 18, 2015, that she did not appear to have any injuries. *Id.* at 3. However, she "appeared to have some developmental delays and suffered from non-verbal autism[.]" *Id.* at 3-4.

The Children were placed in protective custody on April 22, 2015. T.D.N.T.R. was discharged from the hospital on April 28, 2015, and he was placed in a foster home separate from his sister, L.M.R. The Children were adjudicated dependent on May 13, 2015. On November 10, 2015, the trial court found that aggravating circumstances existed as to Mother and Father.

The Community Umbrella Agency ("CUA"), Northeast Treatment Center ("NET"), developed the following Single Case Plan ("SCP") objectives for Mother: attend the Children's medical appointments; participate in the supervised visitation schedule; schedule an assessment with the Behavioral Health System ("BHS"); participate in a domestic violence program; participate in and completing parenting classes; and comply with all court

orders and recommended programs. *Id.* at 8. The CUA subsequently specified that Mother explore services for L.M.R. at Children's Crisis Treatment Center ("CCTC") and participate in a domestic violence program at Women in Transition. *Id.* at 9-10.

Commencing in October of 2015, permanency review hearings occurred approximately every three months.[1] At the permanency review hearing in May of 2016, the trial court found that T.D.N.T.R. received early intervention services, occupational therapy, and physical therapy. *Id.* at 13. Further, L.M.R. received occupational therapy, physical therapy, and trauma therapy. *Id.* at 12-13. At the next hearing in August of 2016, the court found that "L.M.R. receives special education." *Id.* at 13.

On April 4, 2017, DHS received another supplemental report alleging that Father "had made a written statement that day stating that on 4/17/2015, while engaging in an incident of domestic violence with Mother, T.D.N.T.R. was thrown from Mother's arms and hit his head on a piece of furniture and then the floor." *Id.* at 16 (citation to record omitted).

On July 27, 2017, DHS filed petitions for the involuntary termination of Mother's and Father's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). A hearing occurred on the petition

---

[1] The Honorable Allan L. Tereshko presided over the underlying dependency matter and the subject involuntary termination proceeding.

regarding Mother on August 15, 2017,[2] during which the Children were represented by a Child Advocate and a Guardian *Ad Litem* ("GAL").[3] DHS presented the testimony of Erica Williams, Psy.D., the director of Forensic Mental Health Services, who performed a parenting capacity evaluation of Mother on February 23, 2017; and Beverly Ford-Green, the CUA case manager. Mother testified on her own behalf. In addition, Mother was represented by Anthony J. Voci, Jr., Esquire, whom she privately retained.

Dr. Williams testified that, in conducting the parenting capacity evaluation, she learned that Mother had participated in two different interviews during the investigation of T.D.N.T.R.'s nearly fatal injuries, and that she "was adamant that it was an accident." N.T., 8/15/17, at 32. She testified that at the time of the parenting capacity evaluation on February 23, 2017, Mother "was able to identify [the cause of the incident] [as] active aggression [on Father's] part, but she still is not able to fully explain the process of events. And when she discusses it, she limits her memory of it. She doesn't respond to follow-up questions. She's not able to plan differently,

_____

[2] At the commencement of the proceedings, Father's counsel requested to withdraw his representation, which the trial court granted. Therefore, the court re-scheduled the hearing on the petition with respect to Father for January 30, 2018. Trial Court Opinion, 11/9/17, at 2. The record certified for this appeal does not reveal the court's disposition of that petition.

[3] The Child Advocate and the GAL argued in support of the involuntary termination of Mother's parental rights to the Children during the hearing. Neither has filed a brief in these appeals.

just to assert that she's learned her lesson and she would do it differently, but she can't explain beyond that." *Id.* at 36-37.

Dr. Williams opined that Mother "did not have the capacity for safety and permanency at the time of the evaluation, particularly due to the ongoing safety concerns." *Id.* at 47. She summarized as follows.

> [P]rior to the precipitating event [on April 17, 2015,] [T.D.N.T.R.] somehow suffered injuries that were healing and nobody was able to identify how those injuries occurred, neither [Mother] nor [Father]. Then the events occurred, even though she was aware of his violent temper, they continued to reside together. He, I later found out from him, swung at her in a smacking motion and that's what knocked [T.D.N.T.R.] out of her arms. She provided misinformation at the time of medical intervention, which immediately places the child at risk for her not to provide the true sequence of events, particularly when you're providing emergency care. So that judgment to not provide the accurate information is a concern. And then moving on from there, she continues to minimize the events and not see [Father] as capable of violence going forward. She was unable to recall things that happened, was able to say that she had a role, but couldn't identify the role of what she could do differently. She was comfortable with the [C]hildren going back with [Father] and she was not able to even identify any of the concerns raised by CUA regarding her behaviors that placed the [C]hildren[] . . . at ongoing risk.

*Id.* at 64-65.

Further, with respect to L.M.R., Dr. Williams testified that, while in the care of Mother, she presented with "gross developmental delays. However, outside of the care of . . . [M]other, she has thrived and those delays have all but disappeared." *Id.* at 41.

To assist her in developing the capacity to parent, Dr. Williams made the following recommendations, in part.

1.    [Mother] continue in individual therapy.  It is recommended this treatment occur with a licensed individual with training and experience in working with individuals involved in the physical abuse of a child.  In addition to identification and addressing of mental health needs, it is important focus include supporting [Mother] in developing an accurate narrative of the events leading to her son's near fatal injuries as well as when he obtained his prior injuries.  Once events are identified it is imperative therapy focus on exploring the behavior cycles related to the events, identification of role in the events and plan to recognize, manage and prevent future behaviors.

2.    If reunification remains the goal, it is important [Mother] increase her engagement in [L.M.R.]'s medical and mental health appointments.

Parenting Capacity Evaluation, 2/23/17, at 15 (DHS Exhibit 6).

By decrees entered on August 15, 2017, the trial court terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  On September 14, 2017, Mother, acting *pro se*, timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b),[4] which this Court consolidated *sua sponte*.

_____

[4] Mother asserted the following errors in her concise statement.

1. The Trial Court (Family Division) erred and abused its discretion in denying my 6th Amendment right when I requested a continuance in order to have representation from another Attorney.  This was requested so that I would have the opportunity to be represented by an Attorney who would represent my family's best interests.  The attorney, Anthony Voci, who represented me at the hearing, never communicated with me in the four months preceding my hearing; furthermore, he was tardy (by 2 hours) and initially reluctant

On October 12, 2017, this Court granted the motion to withdraw as counsel filed by Mother's trial attorney, Attorney Voci, and directed the trial court to appoint substitute counsel within ten days. By order dated October 17, 2017, the trial court appointed Michael Graves, Jr., Esquire, as Mother's appellate counsel. The trial court filed its opinion pursuant to Pa.R.A.P. 1925(a) on November 9, 2017.

On January 21, 2018, Attorney Graves filed a petition for leave to withdraw as counsel and an ***Anders*** brief, which we must address before

_____

> to represent me as he expressed this to me outside the courtroom. Therefore this already demonstrated a conflict of interest. Nevertheless, the court ignored my request to fair representation and proceeded with the hearing with the above attorney, who had not prepared to represent me for my . . . hearing on August 15, 2017.
>
> 2. The Trial Court (Family Division) erred in finding that DHS, NET CUA 1 (Beverly Ford-Green), Support Center for Child Advocates, (Guardian Ad Litem Jerry Desiderato, Attorney Irene Levy), City Solicitor (Megan Fitzpatrick), ATA (Evaluator Erica Williams) met their burden of proof by clear and convincing evidence that terminating my parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8).
>
> 3. The Trial Court (Family Division) erred in finding that DHS, NET CUA 1 (Beverly Ford-Green), Support Center for Child Advocates, (Guardian Ad Litem Jerry Desiderato, Attorney Irene Levy), City Solicitor (Megan Fitzpatrick), ATA (Evaluator - Erica Williams) met their burden of proof by clear and convincing evidence that terminating my parental rights would best meet to the developmental, physical and emotional needs and welfare of [the Children] pursuant to 23 Pa.C.S.A. § 2511(b).

Mother's Rule 1925(b) statement, 9/14/17.

- 8 -

reviewing the merits of this appeal. ***Commonwealth v. Rojas***, 874 A.2d 638, 639 (Pa. Super. 2005) (quoting ***Commonwealth v. Smith***, 700 A.2d 1301, 1303 (Pa. Super. 1997)).

***In re V.E.***, 611 A.2d 1267 (Pa. Super. 1992), this Court extended the ***Anders*** principles to appeals involving the termination of parental rights. In ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009), our Supreme Court explained, "the major thrust of ***Anders*** . . . is to assure that counsel undertakes a careful assessment of any available claim that an indigent appellant might have." ***Id.*** at 358.  The Court stated that this "is achieved by requiring counsel to conduct an exhaustive examination of the record and by also placing the responsibility on the reviewing court to make an independent determination of the merits of the appeal." ***Id.***

In order to be permitted to withdraw, counsel must meet three procedural requirements: 1) petition for leave to withdraw and state that, after making a conscientious examination of the record, counsel has determined that the appeal is frivolous; 2) furnish a copy of the ***Anders*** brief to the appellant; and 3) advise the appellant that he or she has the right to retain private counsel or raise, *pro se*, additional arguments that the appellant deems worthy of the court's attention. ***See Commonwealth v. Cartrette***, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted).  With respect to the third requirement, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising

him or her of their rights." ***Commonwealth v. Millisock***, 873 A.2d 748, 752

(Pa. Super. 2005).

Additionally, an ***Anders*** brief must comply with the following

requirements:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361.

Instantly, Mother's counsel filed a petition to withdraw which complies

with the foregoing procedural requirements. In addition, counsel filed a brief,

which includes a summary of the history and facts of the case, potential issues

that could be raised by Mother, and his assessment of why those issues are

meritless, with citations to relevant legal authority. Therefore, Mother's

counsel has satisfied the requirements of ***Anders*** and ***Santiago***.

We next proceed to review the issue outlined in the ***Anders*** brief. In

addition, we must "conduct an independent review of the record to discern if

there are any additional, non-frivolous issues overlooked by counsel."

***Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa. Super. 2015)

(footnote omitted).

In the ***Anders*** brief, counsel raises the issue of whether DHS satisfied its burden of proof to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[5] Specifically, counsel states that Mother complied with some of her SCP objectives.

We review this issue according to the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for

---

[5] To the extent that the ***Anders*** brief raises an issue concerning the permanency review orders changing the Children's goals to adoption, we conclude that it is waived because Mother did not file a notice of appeal from those orders, and she did not assert any errors regarding them in her concise statement of errors complained of on appeal. ***See Dietrich v. Dietrich***, 923 A.2d 461, 463 (Pa. Super. 2007) (stating that when an appellant filed a Rule 1925(b) statement, any issues not raised in that statement are waived on appeal).

termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). In addition, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In this case, the record evidence supports the court's decision to terminate Mother's parental rights pursuant to the following statutory provisions:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).[6]

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section **2511(a)(2)**: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination of parental rights

---

[6] Based on this disposition, we need not review the decrees pursuant to Section 2511(a)(1), (5), and (8).

under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

In this case, the trial court stated on the record in open court at the conclusion of the testimonial evidence, as follows.

> [T]he issue of credibility looms very large since we have conflicting versions of what has happened over the last 28 months.
>
> [A]lthough counsel says that [M]other admits that she didn't tell the truth in the beginning, it was no such admission, because she still maintained the narrative that she fell on the child while the child was in the bed. And she now describes it as backed up on the child. Her earlier description was fell on the child.

That's disturbing to the [c]ourt, because it supports a person who has not acknowledged the reality of what occurred and until today, although she voices a certain narrative, the narrative hasn't changed. That presents an issue for the [c]ourt in everything else that [M]other says.

And after having listened to [M]other and having had jurisdiction over this case from the beginning, I believe, I conducted the aggravated circumstances hearing, heard the testimony from the expert witnesses. And this child was not a child who fell onto a bed and parent toppled over onto the child. This child has been the victim of a consistent pattern of abuse and violence. No one's addressed the prior issue of the healing injuries of the child, other than [M]other's not credible attempt to explain that it occurred during an incident with the car seat.

It's a continued narrative, which [M]other refuses to accept the reality of the brutality that was inflicted upon this child while in her care in the care of the father. While she may not have been the perpetrator of the actual violence, she stood by and watched it occur[], knew it occurred, when it was occurring. And even today, attempts to paint a different picture, paint a picture of a man who has been found to have been abusive to a completely helpless infant, suggesting that he may be an appropriate caregiver for the child.

It engages the question whether [M]other has the ability to perceive the reality of threats to her children. And being unable to perceive the reality of threats to her children, she certainly could never be in a position of being charged with the safety of her children.

As to the evidence of her addressing some of the goals, while [M]other testified that she has been receiving this domestic violence [program], other than her testimony, I have no evidence of it. Today's the day when you bring in your evidence. Today's the day of your hearing. Today is the day you get to present all you have to make your case. And other than . . . what could be considered as self-serving testimony, I [have] seen or heard nothing independent of that to substantiate it.

But it goes to the issue of her treatment for her issues, the domestic violence. There is no evidence that she completed the child abuse training. There is no evidence that she ever engaged

- 15 -

in therapy which would allow her to acknowledge the child abuse that brought this case in and is now one of the central reasons why the child[ren] remain in care.

The evidence is clear and convincing that she has not remedied the issues that brought these children into care. The limited attempt at securing some domestic violence goes to the [M]other's issues that brought the children into care. It doesn't go to the issue of her putting herself in a position to care for these children or provide safety, well-being for these children going forward.

The evidence is clear and convincing that she has no ability to remedy the issues that brought the children into care going forward. The inability to remedy the issue is premised on the fact that she fails to recognize what issues actually brought these children into care.

. . .

She continued to hold out a narrative that the . . . perpetrator of the abuse to [T.D.N.T.R.] is now potentially able to care for these children and keep these children safe. That suggests a certain disconnect from reality. . . . The disconnect from reality in suggesting that as of today, even knowing that the father at some point admitted that the story they told originally about the child falling on the bed was a complete lie.

. . .

N.T., 8/15/17, at 124-128.

Mother's testimony supports the court's findings. Mother acknowledged that she did not previously provide full, complete, accurate, and truthful information regarding how T.D.N.T.R. was injured in April 2015 because she "was scared." N.T., 8/15/17, at 102. She testified on direct examination,

Q. What were you scared of?

A. [B]ecause my son had injuries and I knew in my heart that it was an accident.

- 16 -

. . .

A.    I knew that when he went to get medical attention . . . [h]e was well-taken care of and . . . they figured it out, you know, what his injuries were and he was able to make medical progress.

*Id.* at 102-103.

With respect to how T.D.N.T.R.'s injuries occurred, she testified as follows on direct examination:

Q. [Y]ou said that an argument took place between you and [Father], correct?

A. Yes.

Q. And you said in the past that he became aggressive towards you, correct?

A. Yes.

Q. What happened after [Father] became aggressive towards you while you were holding [T.D.N.T.R.]? What happened to your son?

A. I remember placing him on the bed and [Father], at that time, . . . he wasn't near me at the time, but at some point, I accidentally moved back on my son. And that's how he got injured.

THE COURT: I'm not sure I understand what you're saying. You moved back on your son, what does that mean?

[A.] That means that I had rolled back on my son in the bed, just perceived trying to –

THE COURT: It's the same story you told the [c]ourt, you fell on top of the child when the child was in the bed, correct?

[A.] I wouldn't say I fell, but I moved back on him.

*Id.* at 105-106.

In her cross-examination by the GAL, Mother testified regarding T.D.N.T.R.'s injuries before April 17, 2015, as follows.

Q. [T.D.N.T.R.] had injuries prior to this incident, is that correct?

A. Yes.

Q. Where did they come from?

A. There was an issue with his car seat. I took him to CHOP [Children's Hospital of Philadelphia] and I remember trying to take him out of his car seat and I didn't realize the restraints were on and he fell back. But CHOP examined him and saw that there were no injuries.

Q. Was he injured as a result of [F]ather's abuse prior to this incident?

A. No.

*Id.* at 109-110.

In addition, Mother testified that Father should have a relationship with the Children, and that they may be safe in his care, as follows.

Because he is a good father and he advocates for his children. He loves his children and he always makes them a priority. And despite what happened between myself . . . and him, that we no longer have a romantic relationship. We -- when I say working relationship, we work together for the interest of the children. And working relationship means co-parenting.

Q. You believe the [C]hildren would be safe in [F]ather's care?

A. They have been. I understand he's been in unsupervised visitation for four months with no issue. He's had them for entire weekends almost with no issue.

*Id.* at 112.[7]

Ms. Ford-Green's testimony likewise supports the trial court's findings regarding Mother's failure to complete her domestic violence and child abuse SCP goals. Ms. Ford-Green testified that Mother completed the parenting program at ARC, and that she was consistent with her weekly two-hour supervised visits at the agency. *Id.* at 77, 79. However, Mother did not permit Ms. Ford-Green to assess her home. *Id.* at 85. In addition, although Mother attended a domestic violence program at Temple University, Ms. Ford-Green testified that Mother refused to tell her whether she was consulting with a licensed therapist as recommended by Dr. Williams. *Id.* at 90-91, 93. Therefore, Ms. Ford-Green testified that Mother did not comply with obtaining domestic violence and child abuse services. *Id.* at 77, 85.

Mother testified that, for the past two years, she has attended the requisite domestic violence program at Women in Transition. *Id.* at 99. On cross-examination by DHS, Mother acknowledged that Dr. Williams reviewed documentation from Women in Transition in conducting the parenting capacity evaluation. *Id.* at 108. Mother testified that she is "not sure" if she provided

---

[7] Ms. Ford-Green, the CUA caseworker, testified that Father never had unsupervised visits with the Children. N.T., 8/15/17, at 115. She explained that the visits were supervised at his sister's house. However, since April 2017, Father's supervised visits have occurred at the agency because, as discussed above, he "finally confessed" that he "hit [Mother] and that [T.D.N.T.R.] fell from her hand and on a hard surface." *Id.* at 115-116.

Ms. Ford-Green with the information she requested regarding her domestic violence therapy. *Id.* at 110-111.

In addition, Mother acknowledged that she has not complied with her SCP objective to attend the Children's medical appointments. *Id.* at 111, 114. Specifically, Mother testified on cross-examination by the Child Advocate:

Q. Have you ever attended any of [T.D.N.T.R.'s] medical appointments?

A. I have in the past when my work schedule allowed. Just because of my schedule, I pretty much allow his father to take over, because he has more flexible time.

*Id.* at 114. In addition, Mother testified on cross-examination by the GAL:

Q. Did you attend any of [L.M.R.'s] medical appointments?

A. No, I couldn't make it because of my work schedule.

Q. Did you attend any of her educational appointments?

A. Because of my work schedule, I couldn't make it, but I did speak with the teacher or the counselor afterwards.

*Id.* at 111-112.

Based on the foregoing, we conclude that the testimonial evidence supports the trial court's findings, and we discern no abuse of discretion by the court in terminating Mother's parental rights pursuant to Section 2511(a)(2). The record demonstrates that the repeated and continued incapacity, abuse, and/or refusal of Mother to (1) reveal the full truth about the manner in which T.D.N.T.R. sustained his nearly fatal injuries; (2) acknowledge Father's risk to the safety of the Children; and (3) obtain

domestic violence and child abuse counseling from a licensed therapist, have caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being. Further, with respect to L.M.R., in light of her gross developmental delays while in Mother's custody and her significant improvement while in foster care, Mother's repeated and continued incapacity and/or refusal to attend any of L.M.R.'s medical or educational appointments has caused her to be without essential parental care, control or subsistence necessary for her physical or mental well-being. Finally, the causes of Mother's incapacity, abuse, and/or refusal cannot or will not be remedied insofar as the Children have been in placement since April of 2015, and Mother's parental incapacity continued to persist up through and including the termination hearing 28 months later.

With respect to Section 2511(b), we are governed by the following settled principles.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

At the time of the subject proceedings, the Children were two and a half and six years old, respectively. As best we can discern, they were in separate foster homes. The testimony of Ms. Ford-Green supports the following findings by the trial court.

> This [c]ourt heard credible evidence by CUA [c]ase [m]anager, Ms. Ford-Green, who testified that the Children were positively bonded to the Foster Parents. They both look to their foster parents for safety and to meet their needs. She also observed that a bond exists between Mother and [L.M.R.], but it is not a

parental bond, [and] instead resembles a bond with an aunt who visits and brings food and gifts. She opined that Mother is not bonded to [T.D.N.T.R.], at all. She has also observed Mother's interaction with the Children at the supervised visits, noting that Mother would pay more attention to her daughter than her son, and she had to be prompted to attend to the Children. Ms. Ford-Green noted that the Children need the safety and security that Mother cannot provide, and they would not suffer irreparable harm if Mother's parental rights were terminated. . . .

The [c]ourt found credible the evidence that the Children were not bonded to Mother and do not ask to be reunited with her. Therefore, this [c]ourt reasoned that the Children would not suffer irreparable harm if Mother's parental rights were terminated. . . .

Trial Court Opinion, 11/9/17, at 33-34. Accordingly, we discern no abuse of discretion pursuant to Section 2511(b).

Finally, we observe that Mother alleged in her concise statement that the trial court violated her rights under the Sixth Amendment of the United States Constitution by denying her request for a continuance on the day of the hearing for the purpose of retaining another attorney. We review the trial court's denial of Mother's request for a continuance for an abuse of discretion. *See Commonwealth v. Boxley*, 948 A.2d 742, 746 (Pa. 2008).

In its Rule 1925(a) opinion, the trial court properly stated, "Constitutional rights in proceeding[s] to terminate parental rights derive from [the] due process clause of [the] Fourteenth Amendment, rather than from [the] Sixth Amendment." Trial Court Opinion, 11/9/17, at 28 (citations omitted). We have explained, "Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself

- 23 -

in an impartial tribunal having jurisdiction over the matter." ***In re J.N.F.***, 887 A.2d 775, 781 (Pa. Super. 2005).

The trial court aptly explained that, at the beginning of the subject proceedings, Mother sought to replace Attorney Voci, "stating she had not been able to reach him by telephone and he had not responded to her last text to him in April, so she fired him that morning." Trial Court Opinion, 11/9/17, at 29. In response, Attorney Voci stated to the court, "When I arrived this morning, I greeted her and she indicated that she no longer wished me to represent her in this case. As an officer of this [c]ourt, I can also tell the [c]ourt that I have not been paid in full, but I'm ready, willing and able to proceed if the [c]ourt wishes to today." ***Id.*** (citing N.T., 8/15/17, at 19-20). We further observe that Attorney Voci stated to the court, "At the last listing of this case . . ., we met in the room and [I] made very clear [to Mother] as to what was being proposed in terms of the termination of parental rights. I also made it clear what I believed was the proper course of action. My client [has] had no contact with me whatsoever since the last listing of the case. . . ." N.T., 8/15/17, at 19.

The court found on the record in open court that Mother's request was an "unmasked attempt[] to delay and obfuscate these proceedings. There was a representation at the last listing that there would be certain witnesses, certain documents [presented at the hearing]. . . . [W]e're now four months out from the original listing and there was enough time and enough

consideration to allow this case to be prepared for trial. The [C]hildren have been in placement for 28 months. The matter will proceed."[8] N.T., 8/15/17, at 24-25. Upon careful review, we discern no abuse of discretion.

Based upon our independent review of Mother's claims in light of the record evidence, we conclude that she is not entitled to relief. Moreover, the record does not reveal any non-frivolous issues overlooked by counsel. *See Flowers*, 113 A.3d at 1250. Accordingly, we grant counsel's motion to withdraw, and we affirm the decrees involuntarily terminating Mother's parental rights.

Motion to withdraw granted. Decrees affirmed.

Judge McLaughlin joins the memorandum.

Judge Ransom concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/5/18

_____

[8] In its Rule 1925(a) opinion, the court further emphasized that, "during the entire term of this dependency case regarding her Children, Mother was represented by three attorneys," including Attorney Voci, and that she was represented in a competent manner by them. Trial Court Opinion, 11/9/17, at 29.

**THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY**
**IN THE COURT OF COMMON PLEAS**

| | |
|---|---|
| IN THE INTEREST OF: | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-DEPENDENCY |
| | : |
| L.M.R., a Minor | : CP-51-AP-0000754-2017/CP-51-DP-0001030-2015 |
| d/o/b: 04/28/2011 | : |
| | : |
| T.D.N.T.R., a Minor | : CP-51-AP-0000753-2017/CP-51-DP-0001031-2015 |
| d/o/b: 02/12/2015 | : |
| | : |
| | : |
| | : |
| Appeal of: | : Superior Court Nos. 3185 EDA 2017, |
| R.E.R., Mother | : 3186 EDA 2017- Consolidated[1] |

**O P I N I O N**

R.E.R. ("Mother"), Appeals from the Decrees and Orders entered by this Court on August 15, 2017, granting the Petitions to Involuntarily Terminate Mother's Parental Rights to her two minor children: a female, L.M.R., (d/o/b April 38, 2011), and a male, T.D.N.T.R., (d/o/b February 12, 2015), and changing the Children's Permanency Goal to Adoption, filed by the Department of Human Services ("DHS") on July 27, 2017, and served on all parties.

After the Termination/Goal Change Hearing on August 15, 2017, this Court found that clear and convincing evidence was presented to terminate the parental rights of Mother as to both Children. In response to the Order of August 15, 2017, terminating her parental rights, Mother, filed appeals on September 14, 2017.

---

[1] 10/10/2017-Consolidated Sua Sponte-Comment: Review of these matters indicates that these appeals involve related parties and issues. Accordingly, the appeals at Nos. 3185 and 3186 EDA 2017 are hereby CONSOLIDATED. See Pa.R.A.P. 513.

1

DHS also filed Petitions to Involuntarily Terminate Father, E.B.'s Parental Rights to both Children. This Court scheduled a Termination/Goal Change Hearing for Father on January 30, 2018.

## STATEMENTS OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matters Complained of on Appeal, Mother raises the following issues:

1. The Trial Court erred and abused its discretion in denying Mother's 6th Amendment right when Mother requested a continuance in order to have representation from another attorney. This was requested so Mother would have the opportunity to be represented by an attorney who would represent the family's best interests. This attorney demonstrated a conflict of interest. The Court ignored Mother's request for fair representation and proceeded with the hearing, who had not prepared to represent Mother for the hearing held on 8/15/2017.
2. The Trial Court erred in finding that DHS, NET CUA, Support Center for Child Advocates, City Solicitor, ATA evaluator Dr. Williams met their burden of proof by clear and convincing evidence that terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §2511 (a)(1), (2), (5), and (8).
3. The Trial Court erred and abused its discretion in finding that DHS, NET CUA, Support Center for Child Advocates, City Solicitor, ATA Evaluator, Dr. Williams met their burden of proof by clear and convincing evidence that terminating Mother's parental rights would best meet the developmental, physical and emotional needs and welfare of the Children pursuant to 23 Pa.C.S.A. §2511 (b).

## PROCEDURAL HISTORY

On April 17, 2015, the Department of Human Services (DHS), received a Child Protectives Services (CPS) Report alleging that Emergency Medical Services (EMS) was

2

dispatched to the family's home because the Children's Mother, R.E.R., had called and reported that the younger Child, T.D.N.T.R., had fallen. The Report alleged that EMS knocked on the door for several minutes before receiving a response; that Mother refused to allow EMS into the home when she answered the door; that the living room of the home appeared to be unkempt; that Mother muttered under her breath, closed the door and then brought the Child outside in a car seat; that the Children's Father, E.B., did not come outside while EMA was present; that Mother stated that while she and Father were arguing, Father raised his hand as if to strike her while she was holding the Child and she dropped the Child on a mattress to protect him; that EMA observed that the Child did not have any visible injuries but displayed signs of intracranial injury, including a rightward stare and lack of response to stimuli; that in order for the Child to have the type of injury which he displayed, he would had to have fallen from a waist-high height onto a hard surface; and that Mother's explanation of the incident did not match the injury. The Report alleged that Mother stated that there had been a prior incident in which the Child was dropped or had fallen, but she did not elaborate. The Report further alleged that the Child was transported to St. Christopher's hospital for Children and that Mother accompanied the Child to the hospital but appeared agitated and did not appear appropriately concerned for the Child's well-being. This Report was indicated based on medical evidence, and Mother and Father were named as the perpetrators. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"a").

On April 18, 2015, DHS spoke with hospital staff who stated that the older Child, L.M.R., did not appear to have any injuries; that she appeared to have some

3

developmental delays and suffered from non-verbal autism; and that the younger Child, T.D.N.T.R., had been diagnosed with multi-retinal hemorrhaging in both eyes. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"b").

On April 18, 2015, DHS went to the hospital. A Safety Plan was implemented with a family friend whom Mother identified as, S.P., and stated that S.P. would meet L.M.R.'s basic food, medical, and shelter needs while DHS conducted an investigation of the CPS Report allegations. T.D.N.T.R. remained hospitalized at that time. (Exhibit "A" Statement of Facts. attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"c").

On April 20, 2015, DHS went to the hospital. T.D.N.T.R., was undergoing surgery at that time to place a shunt in his head to help evacuate subdural bleeding. DHS met with Mother, who stated that she and L.M.R. had visited a neighbor's home while Father was caring for T.D.N.T.R., and packing the family's belongings for their move the following day; that when Mother and daughter returned to the home, Mother and Father argued and Father physically assaulted her while she was holding T.D.N.T.R.; that she dropped him onto a mattress during the incident and later fell on top of him as Father continued to assault her; that after the incident, she notice that T.D.N.T.R., was no longer crying and his eyes were rolling backward in his head; and she called EMS. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"d").

On April 21, 2015, DHS received a supplemental Report alleging that T.D.N.T.R., had been taken to the Emergency Room at St. Christopher's Hospital on

4

4/17/2015, after Mother stated that she had dropped him on a mattress; that EMS determined that the Child's injuries were consistent with a fall from a waist-high height onto a hard surface; and that Mother's explanation was not consistent with his injuries. The Report further alleged that on 4/21/2015, Dr. Maria McColgan certified the incident as a "near fatality"; that the Child was in critical condition based on suspected abuse; that he had internal bleeding from old and new injuries; and that it was not known at that time if the Child would survive. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"e").

On April 21, 2015, DHS received a second supplemental Report alleging that on 4/17/2015, Father hit Mother repeatedly while she was holding T.D.N.T.R.; that she dropped the baby and Father continued to hit Mother until she fell on the Child; and that the Child subsequently became unresponsive, with limp arms and his eyes rolling toward the back of his head. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"f").

DHS learned that T.D.N.T.R., had also been treated at Children's Hospital of Philadelphia (CHOP) on 4/5/2015 after Mother and Father reported that the Child had fallen several inches back into his car seat when Mother was attempting to remove him from the car seat without first removing the restraint. CHOP staff determined that the Child did not have any injuries at that time, and he was discharged to his parents' care. Mother subsequently provided a different explanation for the Child's 4/05/2015 injuries, stating to St. Christopher's Hospital staff in late April 2015 that the Child's car seat had overturned and he had hit his head. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"g").

5

At St. Christopher's Hospital in late April 2015, T.D.N.T.R., was diagnosed with acute or chronic bilateral subdural hemorrhages, multilayer retinal hemorrhages in both eyes, a closed right rib fracture, and a cervical spine injury, most likely due to abusive head trauma in the absence of accidental trauma to account for the injuries. The Child underwent surgery to place a drain in his head to help evacuate the subdural bleeding and also required a cervical collar for his neck for several weeks. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"h").

Mother's explanation for the incident continued to not match the nature of the Child's past or present injuries. Father provided no explanation for the Child's past or present injuries to either DHS or hospital staff. DHS had received different accounts of the nature of the 4/5/2015 incident, for which the Child was examined at CHOP, and DHS had also received accounts alleging that Father had displayed disruptive behavior at the Child's medical appointments in the past. Furthermore, DHS learned that Mother had full-time employment and that Father was unemployed and cared for the Children alone at home while Mother worked. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"i").

On April 22, 2015, DHS obtained an Order of Protective Custody (OPC), for both Children. On 4/23/2015, L.M.R., was placed at Baring House, and T.D.N.T.R., was discharged from the hospital on 4/28/2015, and placed in a Bethany foster home. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"j").

6

Shelter Care Hearings were held for both Children on April 24, 2015, before Juvenile Hearing Officer, William T. Rice. The Court ordered temporary legal custody be transferred to DHS, and placement of the Children was to be in foster care. L.M.R., receives Elwynn services, and is safe as of 4/23/2015. T.D.N.T.R. has head trauma and is currently at St. Christopher's Hospital and is safe as of 4/23/2015. Mother has signed releases. Mother and Father reside at 1844 McClellan St., Philadelphia PA 19145. DHS/CUA to explore family/friends for placement. Mother and Father have line-of-sight supervised visits at the Agency weekly, separate from each other. (Shelter Care Orders, 4/24/2015).

Adjudicatory Hearings for both Children were held on May 13, 2015, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS. Placement of the Children remains in Foster Care. Children adjudicated dependent. Parents are to have supervised line-of-sight only visits at separate times, until investigations are completed. Both Children are safe as of 5/06/2015. Mother is referred to ARC and to a Domestic Violence Program, and also to BHS for an evaluation and consultation. Father is to continue to attend parenting and nurturing classes at Congresso. Children may be moved to sibling's foster home prior to next court listing. Next hearing is listed as a Contested Child Abuse Hearing. Both parents were present at the hearings. (Orders of Adjudication and Disposition—Child Dependent, 5/13/2015).

On June 9, 2015, the 5/13/2015, Court Order was amended to reflect that Father was to be referred for anger management counseling, domestic violence counseling, and to Behavior Health Sciences (BHS). (Exhibit "A" Statement of Facts, attached to DHS

7

Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"m") (Detailed Docket, CP-51-0001031-2015, p.4.)

On June 9, 2015, Community Umbrella Agency (CUA), Northeast Treatment Center (NET), staff developed the initial CUA Single Case Plan (SCP). Mother's objectives included complying with the Children's medical appointments, if she attends; complying with the visitation schedule; scheduling her BHS assessment; participating in a domestic violence program; participating in and completing parenting classes; and complying with all court orders and recommended programs. The plan further stated that visits between the parents and the Children would be held with line-of-sight supervision and that Father was required to leave the building before Mother's visits could begin. Both Mother and Father were present at the meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"n").

On June 24, 2015, Dana P. Reinhold, Ph.D., completed a Psychological Evaluation of Mother. During the evaluation, Mother explicitly refused to answer questions regarding how T.D.N.T.R., had been injured. Dr. Reinhold stated, "It appears possible that Mother is minimizing the domestic violence in her relationship with Father, that she is minimizing the nature of her son's near fatal injuries and that she may be in a state of denial about their causation." The Evaluation noted that if "she cooperated with social services and separated from her partner [E.B., Father], she could have regained custody of her Children in a domestic violence shelter fairly soon after the incident, but has instead continued to cohabit with Father and become less cooperative and forthcoming with authorities, while the Father has refused to be interviewed by police."

8

The Evaluation recommended that Mother complete a domestic violence counseling program, that she complete a parenting program at the Achieving Reunification Center (ARC), and that she participate in individual counseling or psychotherapy to incorporate what she learns in the two programs to enable her to achieve "insight into her own victimization, its effects on her ability to be supportive of her Children…and learning how to appropriately be supportive of her Children's mental health and safety." (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"o").

During mid-to-late 2015, both parents exhibited inappropriate behavior during visits with the Children, including using their mobile telephone during visits rather than focusing on visiting with their Children, making false allegations regarding the Children's treatment in their foster homes, making inappropriate statements to the Children, and harassing and intimidating the foster parents, staff, and other foster children in the foster parents' homes, necessitating the relocation of their visits to a location where more security was available. Both parents continue to reside together and to refuse to discuss the cause(s) of T.D.T.N.R.'s injuries and to admit that he is a victim of abuse. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"p").

On September 30, 2015, CUA revised the SCP. Mother's objectives included complying with the Children's medical appointments; confirming her anticipated attendance at the medical appointments by contacting CUA staff 24-48 hours in advance of the appointment; complying with the visitation schedule and visiting the Children separately from the Father, as ordered by the Court; participating in a domestic violence

9

program at Women In Transition; participating in and completing parenting classes at ARC; and complying with her weekly therapy; exploring services for L.M.R., at Children's Crisis Treatment Center (CCTC); and complying with all court orders and recommended programs. The plan further stated that visits between the parents and the Children would be held with line-of-sight supervision and that Father was required to leave the building before Mother's visits could begin. Both Mother and Father were present at the meeting on 9/30/2015. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"q").

Permanency Review Hearings were held for both Children on October 7, 2015, before the Honorable Allan L. Tereshko. Legal Custody remains with DHS, and placement remains in Foster Care through Bethany. Case continued as Father retained private counsel. (Permanency Review Orders, 10/07/2015).

Permanency Review and Aggravated Circumstances Hearings were held on November 10, 2015 before the Honorable Allan L. Tereshko. The Court found clear and convincing evidence was presented that the alleged aggravated circumstances exist as to both Mother and Father. The Child or another Child of the parent has been the victim of physical abuse resulting in serious injury, sexual violence or aggravated neglect by the parent; proven as to Mother and Father. Legal custody of the Children remains with DHS, placement of L.M.R., remains in Foster Care through Bethany, and placement of T.D.N.T.R., remains in Medical Foster Care through Bethany. Parental visits are to remain line-of-sight supervised with the Children on a weekly basis, and to be held separately. CUA to make forthwith referral to ATA for therapeutic visits for parents and the Children. Visits to be modified once ATA is in place (however ATA visits are to be

in addition to the parents' supervised visits). Visits may be further modified by recommendations of ATA therapist. L.M.R., receives early intervention services for speech through CCTC. T.D.N.T.R. receives Child Link services for Physical Therapy. He is medically followed up on through St. Christopher's Hospital. Court vacates attorney Jennifer Santiago for Mother as she has retained private counsel. All services for the Children to continue. Parents to sign all necessary consents for their mental health, and are allowed to attend the Children's medical appointments and confirm their visits with CUA. CUA to conduct a home assessment on parent's residence and are allowed access. Parents are to be referred for Parenting Capacity Evaluations. L.M.R., may be placed in the home of her sibling, T.D.N.T.R., prior to next court date and by agreement of CUA/DHS and Child Advocate. Both parents were present at the hearings. (Aggravated Circumstances Orders, 11/10/2015) (Permanency Review Orders, 11/10/2015).

Permanency Review Hearings were held for both Children on February 9, 2016, before the Honorable Allan L. Tereshko. Legal Custody remains with DHS, and placement remains in Foster Care. Parents are permitted to continue attending supervised medical appointments for the Children. Referral to ATA to begin supervised therapeutic visits for parents without receiving mental health documentation. Parental visits are modified to 2 hours forthwith. Court orders psychological evaluations and mental health records to CUASW forthwith. CUA to evaluate Mother and Father's home before next court date. (Permanency Review Orders, 2/09/2016).

On February 16, 2016, CUA revised the SCP. Mother's objectives included complying with the Children's medical appointments; confirming her anticipated

11

attendance at the medical appointments by contacting CUA staff 24-48 hours in advance of the appointment; complying with the visitation schedule and visiting the Children separately from the Father, as ordered by the Court; participating in a domestic violence program at Women In Transition; participating in and completing parenting classes at ARC; comply with her weekly therapy; comply with CCTC services for L.M.R.; participate in therapeutic visits at ATA; and comply with all court orders and recommended programs. The plan further stated that visits between the parents and the Children would be held with line-of-sight supervision and that Father was required to leave the building before Mother's visits could begin. Both parents were present at the meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"s").

In early-to-mid 2016, Father moved from the home which he had been sharing with Mother and began residing with his sister in Levittown, PA. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"t").

Permanency Review Hearings were held for both Children on May 10, 2016, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS, placement of L.M.R., remains in Foster Care through Bethany, and placement of T.D.N.T.R., remains in Medical Foster Care through Bethany. Mother has weekly 2 hour supervised visits with the Children at the Agency. Mother is scheduled to PCE on 6/15/2016. Father may begin supervised community visits with the Children as arranged by the parties, and supervised by Paternal Aunt residing with Father. Father's PCE is scheduled for 6/17/2016. L.M.R., receives physical therapy, occupational and trauma

12

therapy and special instruction services. She is medically up to date and scheduled to conduct genetic testing. T.D.N.T.R., receives services followed up by St. Christopher's Hospital, and early intervention services, O.T.P.T., and special instruction. All Services for Children to continue. Parents are to comply with their PCE's and follow any recommendations. Parents are to continue attending the Children's medical appointments. Father referred to BHS for monitoring. (Permanency Review Orders, 5/10/2016).

Permanency Review Hearings were held for both Children on August 9, 2016, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS. placement of Children remains in Foster Care through Bethany. Mother and Children to have visits supervised by the Agency. Children are doing well. and receive early intervention services. L.M.R.. receives special education. Mother is engaged with therapy services. Parents are to continue to attend Children's medical appointments as arranged. Mother to provide documentation of mental health compliance to CUA. CUA to continue to monitor Mother's mental health. Mother to attend PCE part 2, once scheduled. (Permanency Review Orders, 8/09/2016),

Continuances were granted on November 4, 2016. for both Children by Juvenile Court Hearing Officer, Carol A. Carson. Father's counsel requests that matter be heard by a Judge. (Continuance Orders, 11/04/2016).

Permanency Review Hearings were held for both Children on December 1, 2016 before the Honorable Jonathan Q. Irvine. Legal custody of the Children remains with DHS, placement of Children remains in Foster Care through Bethany. Mother to continue with weekly supervised visits by CUA. Father's visits are expanded to

13

overnights in the Paternal Aunt's home where he resides. Mother wishes to proceed without her attorney present. Mother attends Temple for individual therapy, and part 2 of PCE is scheduled for 12/7/2016. Father's PCE is scheduled for 12/12/2016. (Permanency Review Orders, 12/01/2016).

On February 23, 2017, CUA revised the SCP. Mother's objectives included complying with the Children's medical appointments; complying with the visitation schedule, as ordered by the Court; comply with CCTC services for L.M.R.; comply with all court orders and recommended programs. The plan further stated that visits between the parents and the Children would be held with line-of-sight supervision and that Father was required to leave the building before Mother's visits could begin. Both parents were present at the meeting. Copies of the plan were mailed to both parents on 2/28/2017. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"w").

On February 23, 2017, Erica G. Williams, Psy.D., and Samantha Peterson, M.A., of ATA completed a Parenting Capacity Evaluation (PCE) for Mother. As part of the PCE, Dr. Williams asked Mother how T.D.T.N.R., had sustained his injuries which led to DHS involvement with the family. Mother stated during the interview that the Child sustained an "accidental head injury" during "an argument between herself and her significant other" on 4/17/2015, and offered no explanation for his prior injuries. Mother declined to speak further about the incident without her lawyer present at the interview. She returned to meet with the interviewers on a subsequent date, after she reportedly has spoken with her lawyer, and again stated that he Child was "accidentally injured because she may have tripped or something and fallen on a bed', but she stated on several

14

occasions that day that she did not recall details of the incident or events of that day. She stated that she and Father had been arguing on the day the Child was injured, and she specifically denied that there had been physical violence between them. Mother stated during the interview that she has a positive relationship with Father and that although she did not plan to reside with him in the future, she planned to co-parent the Children with Father via telephone and wanted the Children to be returned either to her care or to Father's care. The evaluation noted that Mother had been diagnosed with Persistent Depressive Disorder in the past and recommended that she continue with individual therapy with a licensed individual who has training and experience working with individuals involved with child physical abuse in order to develop an accurate sequence of events that led to T.D.T.N.R.'s various injuries and how to prevent her future behavior that put the Children at risk of harm. The evaluation also recommended that Mother participate in L.M.R.'s medical and mental health appointments and that she maintain her housing and employment. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"y").

In both Mother and Father's PCE, the evaluators noted that neither parent was forthcoming or honest during the test portions of the Evaluation. They stated "that given the extreme nature of the injuries and the unwillingness and/or inability of either parent to identify the cause of the injury, the evaluators cannot endorse capacity for safety of the Children at this time." (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"z").

Permanency Review Hearings were held for the Children on February 28, 2017, before the Honorable Allan L. Tereshko. The ACS requested a continuance because the

15

PCE just received. Status Quo remains and continuance is granted. (Status Review Orders, 2/28/2017).

On March 31, 2017, Mother's therapist, Susan Murray of Temple University Psychological Services Center, wrote a Report in which she stated that in recent therapy sessions, Mother had stated that on 4/17/2015, Father came upstairs while she was caring for T.D.T.N.R., and began yelling at her. She stated that she turned and shoved Father, who then approached her and reached for her as though to hit her. She said that she began moving away from Father, lost her balance while holding the Child, slipped, and dropped the Child, whose body hit a nightstand and then the floor. She stated she placed the Child on the bed in a panic, but the shoving match continued, during which she fell on the bed, and that when Mother returned to the room, she found the Child was no longer crying and was unresponsive, and she called an ambulance. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"aa").

On April 4, 2017, DHS received a Supplemental Report to the April 17, 2015, CPS Report alleging that Father had made a written statement that day stating that on 4/17/2015, while engaging in an incident of domestic violence with Mother, T.D.N.T.R., was thrown from Mother's arms and hit his head on a piece of furniture and then the floor. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"cc").

Permanency Review Hearings were held for both Children on April 11, 2017, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS, placement of Children remains in Foster Care through Bethany. Mother and Father

16

to have supervised visits at the Agency to occur as arranged. Children are safe in the current placement as of 4/03/2017. DHS commitment stands, all appropriate services to continue. Next Court date is contested goal change termination hearing on 8/15/2017. (Permanency Review Orders, 4/11/2017).

On May 18, 2017, CUA revised the SCP. Mother's objectives included complying with the Children's medical appointments; complying with the weekly visitation schedule, as ordered by the Court; participating in therapy that addresses child abuse at ATA, Temple University, or another appropriate provider; and participate in the Individual Education Planning for L.M.R. The plan further stated that visits between the parents and the Children would be held with line-of-sight supervision and that Father was required to leave the building before Mother's visits could begin. Both parents were present at the meeting. Copies of the plan were mailed to both parents on 7/07/2017. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 7/27/2017, ¶"ee").

## TERMINATION HEARING

This Court held the Contested Termination and Goal Change Hearing for both Children on August 15, 2017, regarding Mother's parental rights. Mother was present at the hearing, and represented by counsel, Anthony Voci, Jr. (N.T. 8/15/2017, p.6 at 8-9; p.18 at 23-25).

Counsel for DHS, Megan Fitzpatrick, called the first witness, Dr. Erica Williams, Psychologist, Forensic Mental Health Services, and all parties stipulated to her qualifications as an Expert in Forensic Psychology. She testified she conducted the

17

Parent Capacity Evaluations on both Mother and Father. Mother participated in the MMPI in June 2016, a clinical interview and completed the child abuse potential inventory in December 2016. Mother returned for a follow-up clinical interview in January 2017. (N.T. 8/15/2017, p.27 at 21-25; p.28 at 1-20).

Dr. Williams testified the circumstances that brought the two Children into care occurred when T.D.N.T.R., required ambulance intervention and then subsequent emergency room intervention due to injuries that were later classified as near-fatality to include head, and neck injuries, possible issues with his cervical bone, and concerns about bruising. And throughout the investigation and the subsequent interventions that the Child required, they found healing injuries as well. They were classified as non-accidental. At that time, Mother reported that they were due to abuse by Father and her subsequently dropping the infant onto a bed and falling on him. It was ruled that could not cause his injuries and that he had to have fallen from at least waist-high and hit a hard surface. (N.T. 8/15/2017, p.31 at 6-23).

She further testified that Mother was unable to provide an explanation that was consistent with medical documentation. Mother was adamant that it was an accident. During the interview, Mother wanted to discuss the interview with her attorney and rescheduled her appointment. During the follow-up interview, Mother did not report the incident as accidental, however, she stated she was unable to recall what happened and did later admit that Father had acted aggressively towards her before the injuries to the Child occurred. Mother was in therapy at the time at the request of the Court, and continued to deny any other instances or concerns and a belief that it would never occur again. Mother related to her that the communication between herself and the Father was

18

only for the Children and that their focus and goal was for the Children to be returned to herself or to the Father. Both parents denied a romantic relationship, stating they only maintained contact for the Children. (N.T. 8/15/2017, p.32 at 3-25; p.33 at 1-25; p.34 at 19-25; p 35 at 1-9).

Dr. Williams' concern was Mother's inability or unwillingness to admit to the violence and the pattern of violence, despite her awareness of the data. Her awareness that Father stopped EMS from getting to the Child when he needed care. Father has been aggressive and intimidating to her, yet Mother still felt that he could parent the Children safely. She was not able to connect this pattern of his behavior that resulted in the near-fatality of her Child and the fact that it would be concerning for her to support and endorse him to provide care for the Children. (N.T. 8/15/2017, p.34 at 5-18).

Dr. Williams testified that Mother's ongoing support and collaboration with Father, while asserting that the injuries were accidental, not intentional and kind of abdicating any understanding of the abuse, it is a concern that the collaboration continues and the support for him continues given the fact that he perpetrated this abuse and she should be in a position to provide safety and prevent further abuse for her Children, but does not see the risk for what it is. Mother is able to identify Father's actions as aggression on his part, but she still is not able to fully explain the process of events. When Mother discusses the incident, she limits her memory of it, and does not respond to follow up questions. Mother was present for this negative event that caused injuries to her Child, yet is unable or unwilling to discuss it in detail, plan for future safety of her Children, and has complete willingness, not only to stay connected to Father, but also to allow him to independently care for her Children. (N.T. 8/15/2017, p.37 at 1-18).

19

Regarding visitation, Dr. Williams noted that the Court ordered the supervised visits be changed from the parents seeing the Children together to visits occurring separately. The visits were moved to the Agency for the safety of CUA and other individuals and security was involved in the visits because when the parents were together they behaved in aggressive manners and the resource parents felt threatened. The parents continued to engage in behaviors that disrupt the Children and do not support their safety and permanency. Even with the intervention, the parents are not demonstrating any change or progress to help support the Children to do well or function well. (N.T. 8/15/2017, p.37 at 19-25; p.38 at 1-25; p.39 at 1-4).

Dr. Williams noted L.M.R.'s diagnosis related to developmental disorder spectrum. At the time L.M.R., was in the care of her Mother, she presented with gross developmental delays. However, outside of the care of her Mother, the Child has thrived and those delays have all but disappeared. Dr. Williams opined that it is relevant that L.M.R., rapidly improved outside the care of Mother. (N.T. 8/15/2017, p.40 at 12-25; p.41 at 1-18).

Dr. Williams noted that Mother is not in a caregiving role to the Children, and therefore, there is not a parent-child bond. The Children have been out of her care over two years, and her visitation has been limited on a weekly basis. The fact that the visitation has been limited creates a question point as to why parent's visitation was not moved forward. (N.T. 8/15/2017, p.42 at 1-25; p.43 at 1-8).

Dr. Williams administered the Child Abuse Potential Inventory (CAPI) test to Mother. Mother was not able to provide responses that allowed her to further explore her potential due to her level of faking good which means that there is a specific scale that

20

pulls for any inability or unwillingness to respond. It finds whether the individual is not willing to even admit to what every individual would engage in. It is potential deception, and in cases such as this, Mother is hyperaware of what we consider high stakes for her, the custody of the Child, she overtly presents herself in a light of absolutely doing no harm. So in effort to best support herself in their case, she is misguided and ends up presenting an invalid protocol that does not allow us to look further. (N.T. 8/15/2017, p.44 at 15-25; p.45 at 1-20).

Dr. Williams administered the MMPI2 test and Mother did show some strengths: able to maintain appropriate and consistent housing; had substantial employment; has financial ability to provide for the Children; she attends mental health treatment; and is consistent with her visitation with the Children. Despite these strengths, however, Dr. Williams' opined that Mother did not have the capacity for safety and permanency at the time of the evaluation, particularly due to the safety concerns. (N.T. 8/15/2017, p.45 at 23-25; p.46 at 25; p.47 at 1-25).

Dr. Williams stated the ongoing safety concerns are about Mother's continued misrepresentation of the events leading to T.D.T.N.R.'s injuries, her own inability or unwillingness to see the events for how they occurred, and her ongoing willingness and support for the Father, the perpetrator of the abuse, to parent the Children in her absence. (N.T. 8/15/2017, p.47 at 23-25; p.48 at 1-9).

Based on her ultimate opinion that Mother did not have the capacity for safety and permanency to care for her Children, Dr. Williams made recommendations for Mother in order to assist her with developing the capacity to parent her Children. The recommendations were to participate in therapy with an individual who is actually

21

licensed and experienced in working with child abuse, particularly physical child abuse cases, to go beyond her effects of being involved with DHS and to look at, very specifically, the events leading into the abuse, the role she played in the events, and the role that she would need to play in confirming that her Children could be safe going forward and coming up with a plan to include helping herself. (N.T. 8/15/2017, p.48 at 10-25; p.49 at 1-7).

Beverly Ford-Green, CUA-NET Case Manager, was the next witness to testify. She testified the Children came into care on April 17, 2015, when DHS received a CPS Report stating T.D.N.T.R., was injured, nearly fatally, during an altercation between the parents. A single case plan (SCP) was developed for Mother, initially in 2015 and updated in 2017. Mother's objectives were to participate in therapy to address domestic violence; attend line-of-sight-supervised visitation at the Agency with her Children; comply with the Children's medical appointments; and to attend L.M.R.'s individual education plan. Later she was ordered to attend parenting classes and to schedule a BHRS assessment. (N.T. 8/15/2017, p.73 at 6-25; p.74 at 15-25; p.75 at 1-25; p.76 at 1-6).

Ms. Ford-Green testified she became the Case Manager in March of 2017, and Mother completed her PCE with Dr. Williams. One of the recommendations of the PCE was that Mother needed to continue with individual therapy, so she referred Mother to ARC for parenting services. Mother completed the program. She further testified Mother did not participate in any type of therapeutic services. Ms. Ford-Green attempted to contact Mother various times regarding her need to find a therapist to address domestic violence and child abuse, but Mother would not return her telephone calls. She then sent

22

Mother a letter dated June 30, 2017, outlining the goals and that she needed to move forward on those goals. However, she has never received documentation from Mother confirming that she is engaged in this type of therapy, and that this objective is still outstanding in the plan. (N.T. 8/15/2017, p.76 at 7-25; p.77 at 1-25; p.78 at 1-25; p.79 at 1-2).

Ms. Ford-Green testified Mother's current visitation with her Children is on Sundays from 4:00-6:00 p.m., and is supervised line-of-sight at the Agency. She noted that Mother has not had unsupervised visits with her Children because she has still to complete her various objectives. She noted she has observed the visitations and stated Mother favors her older Child and tends to ignore the younger son during the visits. Mother must be prompted to engage with both Children at every visit. Both Children show no adverse reactions when the visits are over and are happy to be reunited with their resource parents. (N.T. 8/15/2017, p.79 at 3-25; p.80 at 1-25; p.81 at 1-14).

Ms. Ford-Green testified she has also observed the relationship between the Children and their foster parents. L.M.R., refers to her foster parent, Ms. McDonald as "mom", and has a very positive and loving relationship with her. The foster mother meets the Child's daily needs, and appears to be happy. Regarding T.D.N.T.R., the Child has been with the same foster parents almost all of his life, and refers to them as "mom" and "dad", and has a loving relationship with them. (N.T. 8/15/2017, p.81 at 15-25; p.82 at 1-25; p.83 at 1-7).

Ms. Ford-Green opined that the Children would not suffer irreparable harm if Mother's parental rights were terminated. L.M.R., is more bonded to her Mother, but like an aunt who comes to visit and brings toys, food and gifts. Further, regarding

23

T.D.N.T.R., she does not observe any bond between Mother and this Child. Mother is more bonded to her daughter than her son. Ms. Green opined that both Children's best interests would be served if Mother's rights were terminated and they were adopted because Mother has not completed her objectives, and has not been truthful or faced what occurred to her son. (N.T. 8/15/2017, p.84 at 12-25; p.85 at 1-25; p.86 at 1-14).

On re-direct examination by Ms. Fitzpatrick, Ms. Ford-Green testified that Father never had unsupervised visits with his Children. The visits were always supervised by the Paternal Aunt, whom he lived with. However, since April 2017, the visitation was changed to supervised at the Agency because Father, on April 4, 2017, disclosed to CUA that he hit the Mother and that T.D.N.T.R., fell from her hands and onto a hard surface. Father had confessed to the incident, and that is when the supervised visits with the Children were returned to the Agency. (N.T. 8/15/2017, p.115 at 15-25; p.116 at 1-22).

Mother was the next witness to testify. She presented a letter dated August 7, 2017, noting that she has been attending domestic violence therapy once a week for three hours per month with counselor Vanessa Martin at Women In Transition. She claimed she has provided documentation in the past to CUA representatives confirming her attendance. (N.T. 8/15/2017, p.97 at 17-25; p.98 at 1-25; p.99 at 1-21; p.100 at 15-25; p.101 at 1-19).

Mother admitted she lied about the incident in the beginning because she was scared. She stated she did not lie to protect the Father, but she did not believe the truth was important because her son was hospitalized and being cared for, and she knew in her heart that the Child's injury was an accident. She noted there came a time when she

24

acknowledged that her son was injured as a result of domestic violence. (N.T. 8/15/2017, p.102 at 18-25; p.103 at 1-25; p.104 at 17-24).

However, upon cross-examination by Ms. Fitzpatrick, the DHS attorney, once again Mother made the same statements she made prior, that she remembers placing the Child on the bed, Father was not near her at that point, and she accidentally moved back on him, or rolled back on him while he was on the bed. During cross-examination, Mother confirmed that medical testimony presented in 2015 in court by Dr. McColgan included his opinion that the injuries to T.D.N.T.R., could not have occurred while laying on a soft surface of a bed. (N.T. 8/15/2017, p.106 at 1-18; p.109 at 1-10).

Further on cross-examination, Ms. Fitzpatrick confirmed with Mother that Dr. Williams had completed her PCE in April 2017, and that the doctor had reviewed the documentation from Women In Transition. So despite the fact that Mother was involved with Women In Transition, Dr. Williams still recommended Mother obtain treatment for domestic violence as well as child abuse. (N.T. 8/15/2017, p.107 at 17-25; p.108 at 1-25).

On cross-examination by Irene Levy, GAL, Mother acknowledges that her son had prior injuries to the near fatal incident. Mother again reiterated that there was an issue with the Child's car seat. She attempted to take him out of the car seat, did not realize the restraints were still on, and the Child fell back. She took the Child to CHOP and they concluded there were no injuries. She denied that prior incident was the result of domestic violence perpetrated by Father. Again, Mother stated she lied to the hospital because she was scared and knew in her heart it was an accident. (N.T. 8/15/2017, p.109 at 16-25; p.110 at 1-24).

25

Mother also confirmed that she had not attended any of L.M.R.'s medical and educational appointments because of her work schedule and she could not make it. Mother claimed she was no longer in a romantic relationship with Father, however she knows he is a good father, loves his Children, and believes they would be safe in Father's care. (N.T. 8/15/2017, p.111 at 18-25; p.112 at 1-24).

Mother also testified that she has attended some of T.D.N.T.R.'s medical appointments in the past when her work scheduled allowed. However, has allowed the Father to take over because he has a more flexible schedule. She estimated she attended at least 10-15 appointments after the surgery. (N.T. 8/15/2017, p.114 at 3-18).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T. 91 A.3d 197 Pa.Super.2014)*.

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts

26

review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

These Children became known to DHS in April 2015, when DHS received a CPS Report alleging that EMS was dispatched to the family's home because the Children's Mother had called and reported that T.D.N.T.R., who was two months old at that time, had fallen. The Child was transported to St. Christopher's Hospital for Children and underwent surgery to place a shunt in his head to help evacuate the subdural bleeding. At the time, Mother stated she was physically assaulted by Father while holding the Child, and she dropped him onto the mattress and fell on top of him. The health care providers noted that the Child's injuries were consistent with a fall from a waist high height onto a hard surface and Mother's explanation was not consistent with the Child's near fatal injuries. On April 22, 2015. DHS obtained an OPC for both Children, then ages two months and four years old, and they were placed in foster care. The Children are now 6 ½ and 2 ½ years old, are safe and all of their needs are being met by their Foster Parents.

### A. The Trial Court Found that Mother's Sixth Amendment and Due Process Rights were not violated, and Mother Received Competent Assistance of Counsel.

Mother's first assertion of judicial error is that she was denied her Sixth Amendment Rights when she requested a continuance on the day of the hearing to retain another attorney. This Court heard from both Mother and her attorney, Anthony Voci, and declined to continue the matter.

Constitutional rights in proceeding to terminate parental rights derive from due process clause of Fourteenth Amendment, rather than from Sixth Amendment. U.S.C.A. Const. Amends. 6, 14. In Interest of A.P., 692 A.2d 240 (Pa. Super. Ct. 1997) The Superior Court summarized constitutional due-process in the context of proceedings to

28

terminate parental rights. "Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." In re J.N.F., 887 A.2d 775, 781 (Pa.Super. 2005). "Due process is flexible and calls for such procedural protections as the situation demands." In re Adoption of Dale A., II, 683 A.2d 297, 300 (Pa.Super. 1996) (quoting Sullivan v. Shaw, 650 A.2d 882, 884 (Pa.Super. 1994).

In this matter, Mother received adequate notice for all hearings, had an opportunity to be heard, and was represented in a competent manner by various attorneys. The Court docket reflects that during the entire term of this dependency case regarding her Children, Mother was represented by three attorneys: Jennifer Santiago, David Michael Kaplan, and finally, Anthony Joseph Voci, Jr.

At the hearing on August 15, 2017, Mother sought to replace Mr. Voci as her attorney, stating she had not been able to reach him by telephone and he had not responded to her last text to him in April, so she fired him that morning. Mr. Voci addressed the Court stating, "I was greeted by her this morning and she indicated that she no longer wished me to represent her in this case. As an officer of this Court, I can also tell the Court that I have not been paid in full, but I'm ready, willing and able to proceed if the Court wishes to today." (N.T., 8/15/2017, p.19 at 5-25; p.20 at 1-21.)

The Court ruled that Mother was never denied the opportunity to participate, testify, and present evidence on her own behalf. She participated, with representation of counsel, in various permanency review hearings and also testified at the August 15, 2017 parental rights termination hearing.

29

B. **The Trial Court Properly Found the Department of Human Services Met Its Burden by Clear and Convincing Evidence to Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), and (2), (5), and (8)**[2]

Mother alleges DHS did not meet its burden by clear and convincing evidence to terminate her parental rights. She claims to have achieved some of her objectives and can be a parent to her Children. The Court disagrees, and found clear and convincing evidence that Mother failed and refused to perform parental duties, failed to address the conditions which brought the Children into placement, and lacks the capacity to adequately provide care and control and a stable environment necessary for the Children's well-being.

This Court relied on credible testimony by CUA Case Manager, Ms. Beverly Ford-Green, who testified that the SCP objectives for Mother were to participate in

---

[2] (a) General Rule.—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

    (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties.

    (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

30

therapy to address domestic violence; attend line-of-sight-supervised visitation at the agency with her Children; comply with the Children's medical appointment; and to attend L.M.R.'s individual education plan. Later she was ordered to attend parenting classes and to schedule a BHRS assessment. In addition, Mother's PCE recommendation was for her to attend domestic violence therapy.

Credible evidence was presented that Mother failed to complete, and still has not completed the objectives in the SCP. Ms. Ford-Green testified she attempted to contact Mother various times regarding her need to find a therapist to address domestic violence and child abuse, but Mother would not return her telephone calls. She then sent Mother a letter dated June 30, 2017, outlining the goals and that she needed to move forward on those goals. However, she has never received documentation from Mother confirming that she is engaged in this type of therapy, and that this objective is still outstanding in the plan. She also noted that Mother has not had unsupervised visits with her Children because she has still to complete her various objectives. She noted she has observed the visitations and stated Mother favors her older Child and tends to ignore the younger son during the visits. Mother must be prompted to engage with both Children at every visit.

The Court also relied on the pertinent and credible testimony of Dr. Erica Williams. She testified she conducted the Parent Capacity Evaluations on both Mother and Father. Mother participated in the MMPI in June 2016, a clinical interview and completed the child abuse potential inventory in December 2016. Mother returned for a follow-up clinical interview in January 2017. Dr. Williams' concern was Mother's inability or unwillingness to admit to the violence and the pattern of violence, despite her awareness of the data. Her awareness that Father stopped EMS from getting to the Child

31

when he needed care. Father has been aggressive and intimidating to her, yet Mother still felt that he could parent the Children safely. She was not able to connect this pattern of his behavior that resulted in the near-fatality of her Child and the fact that it would be concerning for her to support and endorse him to provide care for the Children. She further testified that Mother's ongoing support and collaboration with Father, while asserting that the injuries were accidental, not intentional and kind of abdicating any understanding of the abuse, it is a concern that the collaboration continues and the support for him continues given the fact that he perpetrated this abuse. Mother should be in a position to provide safety and prevent further abuse for her Children, but she does not see the risk for what it is. Mother is able to identify Father's actions as aggression on his part, but she still is not able to fully explain the process of events.

Dr. Williams observed that outside of the care of her Mother, the older Child has thrived and the initial developmental delays have all but disappeared. Dr. Williams opined that it is relevant that L.M.R., rapidly improved outside the care of Mother.

Dr. Williams also administered the Child Abuse Potential Inventory (CAPI) test to Mother. Mother was not able to provide responses that allowed her to further explore her potential due to her level of faking good, which means that there is a specific scale that pulls for any inability or unwillingness to respond. Finally, Dr. Williams stated the ongoing safety concerns are about Mother's continued misrepresentation of the events leading to T.D.T.N.R.'s injuries, her own inability or unwillingness to see the events for how they occurred, and her ongoing willingness and support for the Father, the perpetrator of the abuse, to parent the Children in her absence. Her ultimate opinion was that Mother did not have the capacity for safety and permanency to care for her Children.

32

### C. Trial Court Properly Found that Termination of Mother's Parental Rights was in the Children's Best Interest and that DHS Met Its Burden Pursuant to 23 Pa.C.S.A. §2511(b).[3]

After the Court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best interests of the children pursuant to 2511(b) In re Adoption of C.L.G., 956 A2d 999 (Pa.Super 2008). In terminating the rights of a parent, the Court 'shall give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. In re T.S.M., 71 A3d.

This Court heard credible evidence presented by CUA Case Manager, Ms. Ford-Green. who testified that the Children were positively bonded to the Foster Parents. They both look to their foster parents for safety and to meet their needs. She also observed that a bond exists between Mother and the older Child, but it is not a parental bond, instead resembles a bond with an aunt who visits and brings food and gifts. She opined that Mother is not bonded to her son, at all. She has also observed Mother's interaction with the Children at the supervised visits, noting that Mother would pay more attention to her

---

[3] Other Considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

33

daughter than her son, and she had to be prompted to attend to the Children. Ms. Ford-Green noted that the Children need the safety and security that Mother cannot provide, and they would not suffer irreparable harm if Mother's parental rights were terminated and it would be in their best interest to be adopted.

The Court found credible the evidence that the Children were not bonded to Mother and do not ask to be reunited with her. Therefore, this Court reasoned that the Children would not suffer irreparable harm if Mother's parental rights were terminated, and it would be in their best interests to be adopted.

## CONCLUSION:

At the conclusion of the Hearing the Court stated:

> The issue of credibility looms very large since we have conflicting versions of what has happened over the last 28 months. Although counsel says that Mother admits that she didn't tell the truth in the beginning, it was no such admission, because she still maintained the narrative that she fell on the Child while the Child was in the bed. And she now describes it as backed up on the Child. Her earlier description was she fell on the Child.
>
> That's disturbing to the Court, because it supports a person who has not acknowledged the reality of what occurred and until today, although she voices a certain narrative, the narrative has not changed. That presents an issue for the Court in everything else that Mother says. And after having listened to Mother and having had jurisdiction over this case from the beginning, I believe, I conducted the aggravated circumstances hearing, heard the testimony from the expert witnesses. And this Child was not a Child who fell onto a bed and a parent toppled over onto the Child. This Child has been the victim of a consistent pattern of abuse and violence. No one's addressed the prior issue of the healing injuries of the Child, other than Mother's incredible attempt to explain that it occurred

34

during an incident with a car seat. It's a continued narrative, which Mother refuses to accept the reality of the brutality that was inflicted upon this Child while in her care and the care of the Father. While she may not have been the perpetrator of the actual violence, she stood by and watched it occur, knew it occurred, when it was occurring. And even today, attempts to paint a different picture of a man who has been found to have been abusive to a completely helpless infant, suggesting that he may be an appropriate caregiver for the Child. It engages the question whether Mother has the ability to perceive the reality of threats to her Children. And being unable to perceive the reality of threats to her Children, she certainly could never be in a position of being charged with the safety of her Children.

As to the evidence of her addressing some of the goals, while Mother testified that she has been receiving this domestic violence, other than her testimony, I have no evidence of it. Today's the day when you bring in your evidence. Today's the day of the hearing. Today is the day when you get to present all you have to make your case. And other than her what would be considered as self-serving testimony, I've seen or heard nothing independent of that to substantiate it. But it goes to the issue of her treatment for her issues, the domestic violence. There's no evidence that she completed the child abuse training. There's no evidence that she ever engaged in therapy which would allow her to acknowledge the child abuse that brought this case in and is now one of the central reasons why the Child remains in care.

The evidence is clear and convincing that she has not remedied the issues that brought these Children into care. The limited attempt at securing some domestic violence goes to the Mother's issues that brought the Children into care. It doesn't go the issue of her putting herself in a position to care for these Children or provide safety, well-being for these Children going forward.

The argument was made that Mother has a limited child-parent bond. And it's because of the limited visitation that this bond is of a limited nature. The reality is that Mother has the key and the ability to change that relationship and always had the ability to change that relationship going forward. This case has been well-supervised through DHS,

35

ongoing communication with Mother, ongoing attempt to engage Mother in furthering her relationship with the Children. For reasons only known to Mother, she disengaged from that process. She continued to hold on to a narrative that the abuser of these Children, the perpetrator of the abuse to these Children is now potentially able to care for these Children and keep these Children safe. That suggests a certain disconnect from reality, but after hearing Dr. Williams, it is an understandable disconnect, because Mother engages in another type of reality, a reality that says a child abuser can now take care of the Children safely. The disconnect from reality in suggesting that as of today, even knowing that the Father at some point admitted that the story they told originally about the Child falling on the bed was a complete lie. The fact that the Child fell onto a hard surface, although that's never been identified. The Child had preexisting injuries that were in the process of healing. And the expert testimony at the aggravated circumstances hearing completely rejecting that explanation. Even today, Mother says, well, I just backed up on the Child. And when asked what that meant, she was unable to provide an answer.

As to the bond, the word bond is used frequently, but the issue is there is a parent-child bond. I think the case worker described it accurately. It's as if a friend or well-intentioned nice aunt comes into the room with gifts and goodies and the Children respond accordingly. It has never been described as one where there is a parent-child bond. It's a friend bond. It's a child-adult friend bond. Consistently, the bond between the foster care parents is expressed in clear words that it is a parent-child bond that exists. So in thinking about whether or not there would be irreparable harm to the bond, the evidence is clear and convincing, if the bond is severed, that there would be no irreparable harm, because the bond is minimal.

The evidence is clear, although not lengthy, but listening to the evidence, it was clear that the emotional needs are being met by the foster parents, not the Mother. The issue of well-being of the Children, the issue of the Children perceiving where their safety lies is, again, clear and convincing that they believe that their safety lies with their foster care parent. When the issue of Father's visitation arises and the misconception as to the actual visitation where Mother believed that Father had

36

unsupervised visits with the Children, when it was quite clear that the supervision was to occur in the household of the paternal aunt.

For these reasons, considering the record as a whole, the evidence satisfies the sections under 2511 (a)(1), (2), (5), and (8). Five and eight are established because the Children were removed from Mother's care and the placement has been in excess of one year. 2511 (b) is established because there would be no irreparable harm if this marginal relationship, non-parental relationship, is terminated. Mother's rights are terminated under these sections and I reiterate 2511 (a)(1), (2), (5), (8), and 2511 (b).

(N.T., 8/15/2017, p.124 at 10-25; p.125 at 1-25; p.126 at 1-25; p. 27 at 1-25; p.128 at 1-25; p.129 at 1-25; p.130 at 1-25; p.131 at 1-3).

For the foregoing reasons, this Court respectfully requests that the Decrees and Orders of August 15, 2017, Terminating Mother, R.E.R's Parental Rights to both Children and changing the Children's Permanency Goals to Adoption be AFFIRMED.

BY THE COURT:

_____
ALLAN L. TERESHKO, Sr. J.

__11-9-17__
DATE

37

## CERTIFCATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing OPINION has been served upon the following parties by the manner as designated:

**Family Court Delivery Mail Box**

Michael J. Graves, Jr., Esq.
1700 Market St, Ste 1005
Philadelphia, PA 19103
Counsel for Appellant, Mother R.R.

Meagan Fitzpatrick, Esq. ACS,
Phila Solicitor's Office
One Parkway, 1515 Arch St, 16th flr.
Philadelphia, PA 19102
DHS Counsel

Marguerite C. Gualtieri, Esq.
Support Center forChild Advocates
1617 JFK Blvd., Ste 1200
Philadelphia, PA 1910
GAL for Children

Jerry R. DeSiderato, Esq.
Dilworth Paxson LLP
1500 Market St., Ste 3500
Philadelphia, PA 19102
Co-GAL

Irene Levy, Esq.
1700 Market St., Ste. 1005
Philadelphia, PA 19103
Child Advocate

Emily Cherniak, Esq.
1500 JFK, 2 Penn Center
Suite 1010
Philadelphia, PA 19102
Counsel for Father, E.B.

_____
ALLAN L. TERESHKO, Sr. J.

11-9-17
DATE